## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DUANE KOCH and PATRIOT METAL PRODUCTS, INC.,** | : | |
| | : | |
| **Plaintiffs,** | : | **Civil Action** |
| | : | |
| | : | **No. _____** |
| **v.** | : | |
| | : | **(JUDGE _____)** |
| **MARTIN KOCH,** | : | |
| | : | |
| **Defendant,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **K-FAB, INC.,** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **_____ Nominal Defendant.** | : | |

## COMPLAINT

Plaintiffs Duane Koch and Patriot Metal Products, Inc. (collectively "Plaintiffs"), by and through their undersigned counsel, hereby complain of Defendant Martin Koch as follows:

## INTRODUCTION

1.    This case relates to the unlawful, premeditated, fraudulent attempt by Defendant Martin F. Koch ("Marty") to deceive and defraud his son, Duane M. Koch ("Duane") abetted by a licensed lawyer of approximately $4.1 million dollars and take control of K-Fab, Inc. ("K-Fab") despite Duane's agreement to purchase same.  Duane, Marty and the company jointly owned by them, K-Fab, entered into

an agreement whereby Duane, through K-Fab, would buy out and redeem Marty's 76% interest in the company for approximately $6 million dollars. However, after Marty accepted approximately $3 million dollars up front, and another $1.1 million dollars by way of monthly payments of $42,656.55, Marty through deception and the use of an illusory contract and self-serving agreements prepared by his own attorneys, entered K-Fab along with David Saba, Esquire, a licensed attorney and recently appointed member of the Board of Directors of K-Fab, in a purported meeting on December 14, 2015 accompanied by armed guards and, despite already receiving $4.1 million of the total buyout price of $6 million dollars from his son and K-Fab, stole K-Fab from Duane and escorted Duane from his long-time place of business. To further create problems and frustrate Duane's attempts to run a profitable business, Marty unlawfully hacked into the computer systems of Patriot Metal Products, Inc. ("Patriot Metal"), an entity owned wholly by Duane, in order to illegally illicit information related to Duane's business and personal interests and to further Marty's interests in K-Fab to Duane's detriment.

## PARTIES

2.     Plaintiff Duane Koch is an adult individual and citizen of Pennsylvania domiciled at 728 Overlook Drive, Nescopeck, Pennsylvania 18635.

3.     Plaintiff Patriot Metal Products, Inc. is a Pennsylvania Corporation with its principal place of business at 1005 North Vine Street, Berwick,

Pennsylvania 18603. Patriot Metal works in conjunction with K-Fab in that Patriot Metal paints K-Fab steel products before delivery to K-Fab's customers.

4.     Defendant Martin F. Koch is an adult individual and citizen of Nevada with his domicile at 1898 Braemore Drive, Reno, Nevada 89521.

5.     Nominal Defendant K-Fab, Inc. is a Pennsylvania corporation with its principal place of business at 1408 Vine Street, Berwick, Pennsylvania 18603. K-Fab is named only as a nominal defendant in this action.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 because Plaintiffs seeks redress for a violation of federal law.

7.     This Court has jurisdiction over Plaintiffs' state law claims raised in this Complaint pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this Court because the unlawful misconduct giving rise to this Complaint occurred in the Middle District of Pennsylvania.

## FACTUAL BACKGROUND

9.     K-Fab, located in Berwick, Pennsylvania, is a sole source steel manufacturer that has been in business since 1969.

10.     Patriot Metal, also located in Berwick, Pennsylvania, is a multiple process custom coater, offering cost effective solutions for a variety of industries,

3

including automotive, metal, furniture, agricultural equipment, fasteners, appliances, and many more.

11.   K-Fab performs all aspects of steel manufacturing including material processing, fabrication, machining, assembly and painting for many different sectors of the manufacturing industry, the automotive industry as well as parts for bearings, pumps, valves and pipelines.

12.   Until 2008, K-Fab was operated by Marty (father), but in 2008 Marty turned the operations of K-Fab over to his son Duane due to the illness of Marty's then wife, (Duane's stepmother).

13.   K-Fab, until 2012, was owned by Marty (father) (76%) and Duane (son) (24%).

14.   In 2012, Duane agreed to buy Marty out for complete ownership of K-Fab by way of a stock transfer agreement by Marty to K-Fab.

15.   K-Fab and Marty also entered into agreement whereby K-Fab would lease the commercial premises and industrial/business facilities located at 1411 and 1408 Vine Street, Berwick, Pennsylvania, owned by Marty for thirty thousand dollars ($30,000.00) a month for a period of seven (7) years commencing on January 1, 2013 and ending on December 31, 2019.

16.   In addition, K-Fab and M2d Realty Holdings, a holding company owned primarily by Marty (with Duane as a minority owner), also entered into an

additional lease agreement for commercial premises and industrial/business facilities located at 2100 Dickson Street, Berwick, Pennsylvania for ten thousand dollars ($10,000.00) a month for a period of seven (7) years commencing on January 1, 2013 and ending on December 31, 2019.

17.    As discussed, at the time the parties entered into the agreement to transfer the stock, Marty owned 76% of the outstanding issued shares of K-Fab, and Duane owned the remaining outstanding stock (24%).

18.    On December 19, 2012, Marty agreed to sell K-Fab all of Marty's stock in K-Fab for a total sales price of $6,036,058.00 (the "Sales Price").

19.    One half of the $6,036,058.00 Sales Price was to be paid to Marty through owner-financing, the terms of which provided for interest at the rate of 5%, with monthly payments of $42,656.55 over eighty-four (84) consecutive months (seven (7) years) from K-Fab to begin on January 18, 2013.

20.    The owner-financed portion of the Sales Price was reflected in the Installment Note with Confession of Judgment between K-Fab and Marty (the "K-Fab Note").

21.    The other half of the Sales Price would come by way of loan through First Keystone Community Bank ("FKCB").

22.    FKCB agreed to provide financing of $4,500,000.00 (the "Bank Loan"), $3,018,029.00 of which was earmarked to be paid for Marty for half of the

Sales Price and made by way of a loan agreement dated December 19, 2012, between K-Fab, Duane, and Marty (the "Loan Agreement").

23.     Under the terms of the Loan Agreement, K-Fab "shall pay the K-Fab Note" and K-Fab "shall pay the Bank Loan."

24.     The Loan Agreement provides that K-Fab was required to place into escrow monthly the amount due under the K-Fab Note.

25.     Under the Loan Agreement, K-Fab agreed that K-Fab shall monthly make the required deposit.

26.     Quarterly, Marty was entitled to receive the escrowed payments, provided that K-Fab had fulfilled its obligations under the Bank Loan.

27.     Marty agreed that payments into the FKCB escrow fund shall constitute payment, so long as at the end of each calendar quarter, the escrowed payments are released to Marty.

28.     The Agreement provided that the occurrence of certain events would constitute a default under the K-Fab Note and shall permit Marty to accelerate the balance due under the K-Fab Note and to pursue any and all remedies available under the Loan Agreement and Pennsylvania law.

29.     Events of default under the Loan Agreement included: (a) any default by K-Fab with respect to the Bank Loan, regardless of whether FKCB elected to declare a default; (b) the refusal by FKCB to release escrowed payments on the K-

6

Fab Note at the conclusion of any calendar quarter; and (c) a failure of K-Fab to pay any of its outstanding obligations when due.

30.    The Loan Agreement further provides: "[i]n addition to other rights and remedies available to Marty in the event of a default by K-Fab **and** Duane hereunder, Marty shall have the right to assume control of the operations of K-Fab and to take any and all measures that Marty deems appropriate to secure the payment of the Bank Loan and payment of the K-Fab Note.  Marty shall incur no liability to Duane in connection with his assumption of control, unless his actions are taken in bad faith."

31.    At the signing of the Loan Agreement, Duane was required to collaterally assign to Marty his shares of stock of K-Fab as security for payment of the K-Fab Note and the performance by K-Fab of the obligations under the Loan Agreement.

32.    On December 19, 2012, Duane signed an Irrevocable Stock Power assigning his shares of stock as collateral for the K-Fab Loan.

33.    Under the terms of the K-Fab Note, which was between K-Fab and Marty, K-Fab agreed to make eighty-four (84) monthly payments in the amount of $42,656.55, which Marty was then to receive quarterly.

34.     The K-Fab note provided that the failure of "[Marty] to receive any installment of principal or interest provided hereunder on or before thirty (30) days following the due date thereof shall be a default hereunder."

35.     At or around the time the transactions were made in December 2012, Marty ceased his involvement in the company and relocated to Reno, Nevada.

36.     Marty received the $3,018,029.00 initial payment as well as the quarterly payments of $127,969.65 for each quarter.

37.     K-Fab, through Duane, would place the monthly $42,656.55 in escrow with the bank with the instructions to pay Marty in accordance with the terms of the Loan Agreement.

38.     All was well with K-Fab making payments pursuant to the agreements at issue.  However, Marty remained in Reno until a "new" mom came into the picture and with the assistance of Attorney Saba, Marty concocted a scheme to get back a company he sold after he was substantially paid.

39.     In particular, Marty advanced his scheme to retake control of K-Fab after learning that K-Fab had approximately $36 million dollars in 2016 contracts.

40.     Marty also requested that FKCB conduct a sham audit of K-Fab.

41.     During that time, in or about November 2015, Marty requested that Duane and K-Fab buy Marty out of the rest of his payments, extricate him from certain guarantees, and extend K-Fab's leases with Marty.

42.   Much to Marty's surprise, Duane and K-Fab agreed and obtained the appropriate financing to meet Marty's settlement offer.

43.   Marty, however, reneged on his agreement, and thereafter, on or about Monday, December 14, 2015, Marty, escorted by armed guards and Attorney Saba, purportedly took control of K-Fab by way of an Irrevocable Stock Power dated December 19, 2012 and under the terms of the Loan Agreement, alleged that he was entitled to take over all of the stock of K-Fab owned by Duane.

44.   This was done despite the fact that Marty had already received half of the Sales Price or $3,018,029.00 in December 2012, and K-Fab made approximately thirty-five (35) payments of $42,656.55 (monthly from January 2013 through November 2015) totaling another $1,492,979.25 (including interest), and the fact that there was no allegation of default by Duane.

45.   Accordingly, to date, Marty has received approximately $4.1 million of the $6,036,058.00 Sales Price.

46.   Moreover, subsequent to the December 14, 2015 illicit actions, a mutual friend of Duane and Marty informed Duane that Marty had plotted this scheme for at least eighteen (18) months.

47.   Thus, for at least eighteen (18) months prior to his scheme's culmination, Marty in bad faith accepted quarterly payments paid by K-Fab totaling approximately $800,000.

9

48.     Upon information and belief, on or about December 14, 2015 and December 15, 2015, Marty unlawfully hacked into the computer systems of Patriot Metal, an entity owned wholly by Duane, in order to illegally illicit information related to Duane's business, including Patriot Metal's accounting software, and personal interests and to further his interests in K-Fab to Duane's detriment.

49.     Duane and Patriot stored confidential business information on Patriot's computer systems.

50.     Marty did not obtain Patriot's consent to access its computer system, and knew, at the time he accessed Patriot's computer, that Patriot did not know that Marty was able to access their computer systems.

51.     Marty's December 14, 2015 and December 15, 2015 actions were done to intentionally access Patriot's computer system, without authorization, with the intent and purpose of deleting and destroying files stored on the computer.

52.     Upon information and belief, Marty has continued to illegally access Patriot Metal's computers up to the date of filing of the instant complaint.

53.     In copying the contents of Patriot Metal's computer, Marty intentionally copied not only information which Patriot Metal claimed as its own, but also copied confidential business and personal information created by Duane in his business that, upon information and believe, Marty intends to use to Patriot's and Duane's detriment.

54.   Upon information and belief, Marty without authority and prior to December 14, 2015, hacked into K-Fab's computers/computer systems, which this illicit hacking may have caused Marty to learn of K-Fab's multi-million dollar 2016 contracts.  It is with seeing this pot of gold, Marty apparently decided that these contracts would better fund his and "new" "mom's" Nevada lifestyle and had his armed "goons" move his son out of power and Attorney Saba in.

## COUNT I
## COMPUTER FRAUD AND ABUSE ACT
## 18 U.S.C. §§ 1030 et seq.

### (Plaintiffs vs. Martin Koch)

55.   Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully restated here.

56.   Marty's unlawful misconduct as described above violated the Computer Fraud and Abuse Act, ("CFAA") including, *inter alia*, 18 U.S.C. §1030(a)(2)(C), §1030(a)(4) and §§ 1030(a)(5)(A),(B) and (C).

57.   Section 1030(a)(2)(C) makes it unlawful to intentionally access a computer without authorization or while exceeding authorized access and to obtain information from a protected computer.

58.   Regardless of one's alleged right to access a protected computer, Section 1030(a)(5)(A) makes it unlawful to transmit a program, code, command or

information that intentionally causes damage without authorization to a protected computer.

59.     Sections 1030(a)(2)(B)and(C), respectively, make it unlawful to intentionally access a computer without authorization and to recklessly cause damage or to cause both damage and loss, respectively.

60.     Plaintiffs and K-Fab's computers are high speed, electronic, data processing and memory devices that perform a plethora of logical, arithmetic and storage functions at high speeds and, as such, is a "computer" within the CFAA (hereinafter "the computers").

61.     The computers are used in and affect interstate commerce and are necessarily and routinely used in Plaintiffs' custom coating businesses which engage in and affect interstate commerce, and are routinely used to engage in interstate communications in the furtherance of such business, and is attached to, compatible with and works with the internet as part of the performance of Plaintiffs and K-Fab's businesses, and as such are "protected computers" under the CFAA.

62.     Marty's conduct in intentionally accessing Plaintiffs and K-Fab's computers without authorization to obtain information from the computers is actionable.

63.     Marty's use of, *inter alia*, the unauthorized spyware was also the transmission of a program, code or command that caused damage to the computers

without Plaintiffs' knowledge and or authorization, which was repeated each time Marty accessed the computers.

64.     As a result of Marty's intentional and reckless actions, the integrity and availability of the data, programs, and information on Plaintiffs and K-Fab's computers and systems was and is impaired.

65.     Plaintiffs incurred many costs because of Marty's unlawful misconduct, including but not limited to costs in responding to the offenses described above, assessing the damage and trying to restore the matters, data and information on the computers to the condition they were before Marty's unlawful misconduct.

66.     Both the damage to Plaintiffs' computer and losses incurred by Plaintiffs, including consequential damages, exceed $5,000 in the last year, respectively.     The value of the information Marty obtained through his unauthorized access to and use of the computers was also in excess of $5,000.

67.     Marty's unlawful conduct violates, *inter alia*, Section 1030(a)(2)(C) and (a)(5)(A),(B) and (C) and Section 1030(c)(4)(A)(i) of the CFAA.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Martin Koch and in favor of Plaintiffs in the form of awarding compensatory damages together with interest and costs, including attorneys' fees incurred in remedying Marty's unlawful conduct, preliminary and permanent

injunctive relief and other such relief that this Court deems appropriate under the circumstances.

## COUNT II
## CONVERSION OF BUSINESS INFORMATION

### (Plaintiffs vs. Martin Koch)

68.     Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully restated here.

69.     As set forth above, Marty has intentionally accessed the contents of Plaintiffs and K-Fab's computer/computer systems.

70.     These assets are not the property of, or otherwise owned by, Marty.

71.     Marty acquired confidential business information of Plaintiffs, including information related the accounting and finances of Patriot Metal.

72.     Plaintiffs' business information is kept confidential and is not made known or available outside of its business.

73.     Marty was not authorized to use or access the confidential business information in Plaintiffs' computer/computer system.

74.     Marty accessed Plaintiffs' confidential business information through misconduct by way of hacking into Plaintiffs and K-Fab's computer system illegally and without permission.

75.     Marty has wrongfully exercised dominion and control over Plaintiffs' property in which he has no legal right or interest.

76.   Marty has converted, stolen or otherwise taken Plaintiffs' property which is not his and which properly belongs to Plaintiffs.

77.   Marty's conversion is willful, wanton and intended to inflict malicious injury upon Plaintiffs.

78.   Marty's conversion has resulted in ongoing losses and Plaintiffs are entitled to punitive damages for this malicious conduct.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Martin Koch and in favor of Plaintiffs in the form of awarding compensatory damages, punitive damages together with interest and costs, preliminary and permanent injunctive relief and other such relief that this Court deems appropriate under the circumstances.

## COUNT III
## INVASION OF PRIVACY

### (Plaintiffs vs. Martin Koch)

79.   Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

80.   As set forth above, Marty intentionally accessed Plaintiffs' computer without permission and deleted, destroyed, and copied information.

81.   The accessed computer/computer system contained information about Patriot Metal's business and Duane's personal affairs.

82.     Marty's conduct amounts to an intentional intrusion upon Plaintiffs' physical solitude and seclusion and private affairs.

83.     Marty's conduct in hacking into Plaintiffs' computer and deleting, destroying, and copying the contents, and thereby invading Plaintiffs' privacy, would be highly offensive to a reasonable person.

84.     Marty's invasion of Plaintiffs' privacy has resulted in damages to Plaintiffs and Plaintiffs are entitled to punitive damages for Marty's malicious and intentional conduct.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Martin Koch and in favor of the Plaintiffs in the form of awarding compensatory damages, punitive damages together with interest and costs, preliminary and permanent injunctive relief and other such relief that this Court deems appropriate under the circumstances.

## COUNT IV
## BREACH OF FIDUCIARY DUTIES

### (Duane Koch v. Martin Koch)

85.     Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

86.     Marty, as a director of K-Fab, and former officer of K-Fab, owed fiduciary duties of loyalty, due care, independence, candor, good faith, and fair dealing towards Duane.

87.   Marty breached his fiduciary duties when he engaged in the conduct described herein.

88.   Marty breached his fiduciary duties by his conduct designed to "freeze out" Duane from participation in all aspects related to K-Fab's business.

89.   Marty also breached his fiduciary duties as a former officer/shareholder of K-Fab by using information acquired as an officer/shareholder of K-Fab to Duane's detriment in December 2015.

90.   Marty's actions detailed herein occurred in bad faith.

91.   As a direct and proximate result of Marty's breaches of fiduciary duties, Duane has suffered damages to his business and property.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Martin Koch and in favor of Plaintiffs in the form of awarding compensatory damages, punitive damages together with interest and costs, preliminary and permanent injunctive relief and other such relief that this Court deems appropriate under the circumstances.

## COUNT V
## DECLARATORY JUDGMENT
## 28 U.S.C. § 2201

### (Duane Koch v. Martin Koch)

92.   Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully restated here.

17

93.     An actual controversy exists between Duane and Marty regarding the enforceability and alleged violations of the Loan Agreement.

94.     Pursuant to the terms of the Loan Agreement, while K-Fab was required to make monthly payments -- which it did -- Marty was only entitled to receive the escrowed payments quarterly.

95.     Under the Loan Agreement, Marty only had "the right to assume control of the operations of K-Fab" in the event of a "default by K-Fab and Duane hereunder."

96.     Even if a breach of the Loan Agreement occurred -- which Duane disputes -- it was subsequently cured by payment to Marty.

97.     Duane did not default on any of his obligations under the terms of the Loan Agreement.

98.     Marty's assumption of control over the operations of K-Fab was therefore unlawful and without basis under the terms of the Loan Agreement.

99.     Accordingly, an actual controversy is imminent and inevitable between the parties.

100.    Duane brings this cause of action to request the Court determine Duane's legal right to control K-Fab pursuant to the terms of the parties' agreements.

101.   Alternatively, Duane requests a declaration that he has not violated the terms of the Loan Agreement.

WHEREFORE, Duane Koch respectfully requests this Court enter judgment against Martin Koch and in favor of Duane Koch in the form of awarding compensatory damages together with interest and costs, preliminary and permanent injunctive relief and other such relief that this Court deems appropriate under the circumstances.

**COUNT VI**
**BREACH OF CONTRACT**

**(Duane Koch v. Martin Koch)**

102.   Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

103.   On or about December 19, 2012, K-Fab, Duane, and Marty entered into the Loan Agreement.

104.   Under Pennsylvania law, all contracts, such as the Loan Agreement, include a contractual obligation of good faith and fair dealing.

105.   Specifically, Marty breached the terms of the Loan Agreement, **including its obligations of good faith and fair dealing by** engaging in the conduct described above.

106.   Additionally, Marty breached the terms of the Loan Agreement by assuming control over the operations of K-Fab despite the absence of "a default by

K-Fab **and** Duane."

107.   Duane, as stated, did not default under any of his obligations under the Loan Agreement.

108.   Marty assumed control of K-Fab with the assistance of his attorneys and armed guards in violation of the terms of the Loan Agreement.

109.   Even if a breach of the Loan Agreement occurred -- which Duane disputes -- it was subsequently cured by payment to Marty.

110.   As a direct, proximate and reasonably foreseeable result of Marty's breach, Duane has suffered damages.

WHEREFORE, Duane Koch respectfully requests this Court enter judgment against Martin Koch and in favor of Duane Koch in the form of awarding compensatory damages, interest and costs, preliminary and permanent injunctive relief and other such relief that this Court deems appropriate under the circumstances.

## COUNT VII
## BREACH OF SETTLEMENT AGREEMENT

### (Duane Koch v. Martin Koch)

111.   Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

112.   In or about late November 2015, Marty proposed that he be bought out of the rest of the payments in exchange for Duane and K-Fab paying Marty the

remainder of the Sales Price, extricating Marty from certain guarantees and extending K-Fab's leases with Marty.

113.   Duane and K-Fab timely accepted Marty's offer, agreed to the terms as set forth by Marty, and obtained appropriate financing to meet Marty's settlement offer.

114.   Duane and K-Fab timely accepted Marty's offer before it was revoked or terminated.

115.   Duane and Marty expressed a clear and manifest intent to be bound by the terms of Marty's offer and the parties' bargained-for exchange.

116.   By way of Marty's offer and Duane and K-Fab's timely acceptance, a valid and enforceable contract exists under Pennsylvania law.

117.   Marty breached the settlement agreement by reneging on its terms, i.e., by refusing to be bought out of the rest of the payments in exchange for payment of the remainder of the sales price, extrication from certain guarantees, and extension of his leases with K-Fab.

118.   Marty also breached his obligations of good faith and fair dealing imposed by the terms of the settlement agreement.

119.   Duane has suffered damages as a result of Marty's breach of the settlement agreement.

WHEREFORE, Duane Koch respectfully requests this Court enter judgment

against Martin Koch and in favor of Duane Koch in the form of awarding compensatory damages together with interest and costs, preliminary and permanent injunctive relief, entering an order enforcing the settlement agreement and requiring Marty to comply with the terms of the settlement agreement, and other such relief that this Court deems appropriate under the circumstances.

## COUNT VIII
## UNJUST ENRICHMENT

### (Duane Koch v. Martin Koch)

120.   Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

121.   Duane has conferred benefits to Marty, i.e., over $4 million dollars.

122.   Marty has appreciated those benefits.

123.   Marty has accepted those benefits under circumstances where it would be inequitable to retain those benefits without payment of value.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Martin Koch and in favor of Plaintiffs in the form of awarding compensatory damages, interest and costs, preliminary and permanent injunctive relief and other such relief that this Court deems appropriate under the circumstances.

## COUNT IX
## EQUITABLE RELIEF

### (Duane Koch v. Martin Koch)

124. Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

125. Marty is engaged in practices that violate Pennsylvania law as described herein.

126. Plaintiffs seek injunctive relief to compel Marty to stop the unlawful practices described herein, including their unlawful assumption of control of the operations of K-Fab.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Martin Koch and in favor of Plaintiffs in the form of awarding preliminary and permanent injunctive relief and other such equitable relief that this Court deems appropriate under the circumstances.

## COUNT X
## EQUITABLE ACCOUNTING

### (Duane Koch v. Martin Koch)

127. Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

128. Duane also seeks an equitable accounting under Pennsylvania law. This case involves numerous allegations of fraud and misrepresentation relating to

Marty's conduct in interfering with the operations of K-Fab. The nature and complexity of the scheme engaged in by Marty to take control of K-Fab leaves Duane with no adequate remedy or process to fully assess the scope, magnitude and impact of Marty's illegal conduct.

129. Duane is therefore entitled to an accounting as to all payments, remuneration, and other value provided to K-Fab and an accounting of the monetary benefit conferred on Marty as a result of his improper and illegal practices.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Marty and Marty be ordered to account to Plaintiffs and to prove that funds collected by K-Fab were used for their proper purpose and not to unjustly enrich Marty, as well as awarding Plaintiffs damages in the form of compensatory damages, punitive damages together with interest and costs, and other such relief that this Court deems appropriate under the circumstances.

## COUNT XI
## APPOINTMENT OF RECEIVER/CUSTODIAN

### (Duane Koch v. Martin Koch)

130. Plaintiffs incorporate by reference the allegations stated in the preceding paragraphs as if fully stated herein.

131. Good cause exists for the appointment of a receiver or the appointment of a custodian pursuant to 15 Pa. C.S. §1767.

24

132. Under the Loan Agreement and Irrevocable Stock Power, Duane retained all voting rights in the absence of a default.

133. Furthermore, pursuant to the terms of the Loan Agreement, Marty was only permitted to assume control of the operations of K-Fab in the event of a default by "K-Fab and Duane."

134. As explained above, Duane did not default under the terms of the K-Fab Note.

135. Even if a breach of the Loan Agreement occurred -- which Duane disputes -- it was subsequently cured by payment to Marty.

136. Further, Marty's conduct as explained was illegal, oppressive and fraudulent towards Duane.

137. Duane is of the good faith belief that Marty is unable or unwilling to operate K-Fab as required by the documents described herein (as witnessed by Marty's fraudulent fabrication of an issue with K-Fab's accounting), and therefore, the value of Duane's stock and K-Fab generally is severely jeopardized and in danger of further deterioration.

138. It also appears that Marty is unwilling to and/or incapable of operating K-Fab, which requires immediate relief to protect Duane's interests.

139. Duane is entitled to have the receiver/custodian appointed as a matter of equity to protect himself from irreparable injury by taking actions necessary to

operate K-Fab in a financially-responsible manner and to protect the viability of his interest in K-Fab.

140.   By reason of the foregoing, Duane is suffering and will continue to suffer immediate and irreparable injury, loss and damage unless a receiver is appointed.

141.   Marty's inability to preserve and protect Duane's interest in K-Fab mandates the appointment of a receiver to preserve, protect, and maintain the value of this interest.

142.   The proceeds and revenues of K-Fab constitute a fund in litigation, and the rights of Duane cannot be fully protected without the appointment of a receiver as requested in this complaint.   There is a danger of harm to Duane's interests, thereby authorizing the intervention of equity to appoint a receiver to take possession and control of K-Fab.   Moreover, based on Marty's conduct as described above, there is manifest danger of loss, destruction or diminution in value to Duane's interests in K-Fab.

WHEREFORE, Plaintiffs respectfully request this Court enter judgement against Marty and appoint a receiver/custodian to operate K-Fab and award damages to Plaintiffs in the form of compensatory damages, punitive damages together with interest and costs, and other such relief that this Court deems appropriate under the circumstances.

Respectfully submitted,

/s John G. Dean_____
John G. Dean
Paul A. Galante
Matthew G. Boyd
39 Public Square, Suite 1000
Wilkes-Barre, PA 18701
(570) 371-5290

DATED:  January 11, 2016

## **VERIFICATION**

I, Duane M. Koch, certify and affirm that the factual statements contained in the foregoing complaint are true and correct to the best of my knowledge, information and belief, and are made subject to the penalties of 18 Pa. C.S.A. 4904 relating to unsworn falsifications to authorities.

DATED: January _____, 2016